## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| C. BICKLEY FOSTER, Individually and On Behalf of All Others Similarly Situated, | ) Case No: **JUDGE SULLIVAN** |
| Plaintiff, | ) |
| vs. | ) **CLASS ACTION 11 CIV 6030** |
| ENER1, INC., CHARLES GASSENHEIMER, JEFFREY SEIDEL, ROBERT R. KAMISCHKE, and KENNETH BAKER, | ) **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| Defendants. | ) **JURY TRIAL DEMANDED** |
| | ) **ECF CASE** |

By and through his undersigned counsel, Plaintiff C. Bickley Foster ("Plaintiff") alleges the following against Ener1, Inc. ("Ener1" or the "Company") and certain of the Company's executive officers and directors. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Ener1 and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Ener1's website concerning the Company's public statements; and (d) review of other publicly available information concerning Ener1 and the Individual Defendants.

## I.   NATURE OF THE ACTION

1.    This is a federal securities class action against Ener1 and certain of its officers and/or directors for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons or entities that purchased Ener1 securities between January 10, 2011 and August

1

15, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  The Exchange Act claims allege that Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price.  As a result of the fraud described below, the Company has lost a substantial portion of its value.

2.      Ener1 engages in designing, developing, and manufacturing rechargeable lithium-ion batteries and battery pack systems for energy storage in the United States and South Korea.

3.      Plaintiff alleges that, throughout the Class Period, Defendants failed to disclose material adverse facts regarding the Company's accounting policies and overall financial condition and well-being resulting from the Company's investments in Think Holdings, AS ("Think Holdings"), a Norwegian limited liability company and the majority owner of Think Global, AS ("Think Global"), an electric vehicle ("EV") manufacturer.  Specifically, Defendants failed to disclose that Think Holdings and Think Global suffered from significant capital issues that threatened those companies' ability to maintain operations.  Because of these capital issues, the Company should have taken an impairment charge for the value of its investments in Think Holdings and Think Global since the Company's loan and account receivables due from these companies were uncollectible.  Defendants also failed to disclose that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP") and suffered from inadequate internal controls during the Class Period, all of which rendered Defendants' statements concerning the Company's financial condition and future prospects materially false and misleading.

4.      Due to Defendants' course of conduct, the Company, among other things, was forced to announce on August 16, 2011 that its financial statements for the year ended December 31, 2010 and for the quarter ended March 31, 2011, should no longer be relied upon and would be restated, causing the Company's stock price to plummet over 42% on unusually heavy trading volume.

5.      Defendants' wrongful acts, and false and misleading statements and omissions, have caused a precipitous decline in the market value of the Company's stock.  Plaintiff and the other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

6.      This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b 5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act.  Many of the false and misleading statements were made in or issued from this district.  Many acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, Defendant Ener1's principal executive offices are located in this district.

9.      In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.    Plaintiff

10.     Plaintiff purchased the publicly traded Ener1 securities at artificially inflated prices during the Class Period and has been damaged thereby.

B.      **Defendants**

i.      **The Company**

11.      Defendant Ener1 is a Florida corporation with principal executive offices located at 1540 Broadway, Suite 40, New York, NY 10036.

ii.      **The Individual Defendants**

12.      Defendant Charles Gassenheimer ("Gassenheimer") was, at all relevant times, the Company's Chairman and Chief Executive Officer, and was appointed to these positions with the Company in January 2006.  In addition, Gassenheimer, at all relevant times, was a Director of Think Holdings.

13.      Defendant Jeffrey Seidel ("Seidel") was, at all relevant times, the Company's Chief Financial Officer.  According to the Company's website, Seidel is responsible for strategic initiatives and planning.

14.      Defendant Robert R. Kamischke ("Kamischke") was, at all relevant times, the Company's Chief Accounting Officer and Vice President of Finance

15.      Defendant Kenneth Baker ("Baker") was, at all relevant times, a Director of the Company.  In addition, Baker was a Director of Think Holdings until April 26, 2011.

16.      Defendants Gassenheimer, Seidel, Kamischke, and Baker are collectively referred to herein as the "Individual Defendants."

17.      Ener1 and the Individual Defendants are referred to herein as "Defendants."

18.      During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Ener1, were privy to confidential, proprietary and material adverse non-public information concerning Ener1, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in

4

connection therewith.  Because of their possession of such information, the Individual

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been

disclosed to, and were being concealed from, the investing public.

19.     The Individual Defendants are liable as direct participants in the wrongs

complained of herein.  In addition, the Individual Defendants, by reason of their status as senior

executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of

the Exchange Act and had the power and influence to cause the Company to engage in the

unlawful conduct complained of herein.  Because of their positions of control, the Individual

Defendants were able to and did, directly or indirectly, control the conduct of Ener1's business.

20.     The Individual Defendants, because of their positions with the Company,

controlled and/or possessed the authority to control the contents of its reports, press releases and

presentations to securities analysts and through them, to the investing public.  The Individual

Defendants were provided with copies of the Company's reports and publicly disseminated

documents alleged herein to be misleading, prior to or shortly after their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the

Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

21.     As senior executive officers and/or directors and as controlling persons of a

publicly traded company whose securities were, and are, registered with the SEC pursuant to the

Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the

Individual Defendants had a duty to disseminate promptly accurate and truthful information with

respect to Ener1's financial condition and performance, growth, operations, financial statements,

business, products, markets, management, earnings, and present and future business prospects, as

well as to correct any previously issued statements that had become materially misleading or

untrue, so the market price of Ener1's securities would be based on truthful and accurate

information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.      The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Ener1's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background of Ener1

23.      Ener1, together with its subsidiaries, engages in designing, developing, and manufacturing rechargeable lithium-ion batteries and battery pack systems for energy storage in the United States and South Korea.  The Company operates in three segments: Transportation, Grid Energy Storage, and Small Pack.  The Transportation segment produces batteries and battery solutions for hybrid electric vehicles, plug-in hybrid electric vehicles, and electric vehicles, as well as trucks and buses.  The Grid Energy Storage segment develops and manufactures energy storage applications for utility grid and commercial applications.  The Small Pack segment manufactures lithium-ion batteries for customers in the handheld scanner, personal digital assistant, and medical device markets.

24.      Ener1 serves original equipment manufacturers (OEM) in the light and heavy-duty industries, as well as suppliers of automotive, truck, and bus OEMs; utilities, renewable energy suppliers, solar and geothermal installers, and homeowners; and consumer product companies in the telephone and the hand-held scanner markets.  Ener1 was founded in 1985, is a Florida corporation and is headquartered in New York, New York.

### B.   False and Misleading Statements

25.      The Class Period commences on January 10, 2011.  On that date, the Company filed a Form 8-K with the SEC, signed by Defendant Gassenheimer, in which it announced that

Ener1 and Investinor AS ("Investinor") entered into an Expanded Put Right Agreement.  The

Form 8-K stated in relevant part as follows:

> On January 4, 2011, Ener1, Inc. ("Ener1") and Investinor AS ("Investinor")
> entered into an Expanded Put Right Agreement.  Ener1 may enter into additional
> similar agreements (collectively, the "Put Agreements")  in connection with the
> efforts by Think Holdings, AS, a Norwegian company ("Think"), to raise
> approximately $10 million in bridge financing, which is intended to be
> subsequently converted into Series B Convertible Preferred Stock (the "Series B
> Shares") or other equity in Think.  Ener1 intends to make a $1.67 million loan in
> the same bridge financing, which is also intended to be converted into Series B
> Shares or other equity in Think.  Think is a Norwegian based company that
> develops and produces electric vehicles, and is also a significant customer of
> Ener1.  Both Ener1 and Investinor have substantial equity interests in Think.
>
> Pursuant to Investinor's Put Agreement, Investinor agreed to provide $2.5 million
> in bridge financing to Think and waive certain shareholder rights in Think.  (As
> stated above, it is the intent of the parties for this bridge loan to be converted into
> Think equity.)  As a condition thereto, Ener1 granted Investinor the right to "put"
> (or exchange) the equity into which such bridge loan is intended to be converted
> and also the right to put a prior investment Investinor made in Think in August of
> 2009 ($5.0 million of Series B Shares), in each case, for restricted shares of Ener1
> common stock.  (Under the Think amended and restated shareholders agreement
> (previously filed as Exhibit 10.7 on Ener1's Quarterly Report on Form 10-Q filed
> with the Commission on May 10, 2010), Investinor and certain other investors
> received an additional right to put their investments made in Think in May of
> 2010 for restricted shares of Ener1 common stock.  Investinor purchased $3.3
> million of Series B Shares in May of 2010.)  All of the foregoing put rights expire
> on May 5, 2011.
>
> The price at which Ener1 common stock would be issued in connection with a put
> would be the 15-day volume weighted average trading price of Ener1 common
> stock, determined as of the date on which the applicable put notice is delivered
> (subject to a floor of $4.00).  As of the date hereof, Investinor has not elected to
> exercise its put rights, however, if Investinor exercised its put rights in full today,
> Ener1 would be obligated to issue approximately 2.7 million shares of Ener1
> common stock to Investinor, and in exchange therefore, Ener1 would receive a
> total of approximately 6.5 million Series B Shares and warrants exercisable for an
> additional 1.5 million Series B Shares.
>
> Ener1 may enter into additional Put Agreements with investors participating in
> the remaining balance of Think's bridge financing.  These investors, like
> Investinor, would intend to have their bridge loans converted into Series B Shares,
> and have the right to put their new Series B Shares to Ener1 for restricted shares
> of Ener1 common stock.  The pricing terms of each put is intended to be the same
> as the terms given to Investinor as described above.  If and to the extent an
> investor owns Series B Shares that were purchased in August of 2009 (which do
> not have put rights), it is intended that such investor will receive the right to put

1.08 of such "non-puttable" Series-B Share for each new Series B share purchased.

Ener1 has agreed to register for resale all of the shares of Ener1 common stock that may be issued in connection with these put rights.

The foregoing description of the Put Agreements is qualified in its entirety by the full text of Investinor's Put Agreement, which is attached hereto as Exhibit 10.1, and which is hereby incorporated herein by reference.

If Think is successful in raising the remaining balance of approximately $6.0 million of its bridge financing, then, upon the anticipated conversion of such loans into Series B Shares, Ener1's corresponding put obligations would be approximately 3.1 million shares of Ener1 common stock (using the $4.00 floor price). The foregoing, coupled with all existing put obligations of Ener1, obligates Ener1 to issue up to an aggregate of approximately 8.7 million shares of common stock in exchange for a total of approximately 21 million Think Series B Shares and warrants exercisable for approximately 6.7 million Series B Shares. If all of such puts are exercised, Ener1 would own approximately 68% of the outstanding shares of Think.

26.     On March 10, 2011, the Company issued a press release announcing financial

results for the fourth quarter and full year ending December 31, 2010. In the press release, the

Company reported, among other things, that year-over-year revenue increased 122% and gross

profit margin increased 17.9%. The press release provided in pertinent part as follows:

Ener1, Inc. (NASDAQ: HEV), a leading manufacturer of lithium-ion energy storage systems for transportation, utility grid and industrial applications, today announced financial results for the fourth quarter and full year ending December 31, 2010. Net sales were $33.1 million in the year's final quarter, an increase of 202% over net sales of $11.0 million in the fourth quarter of 2009. For fiscal year 2010, net sales were $77.4 million, an increase of 122% over net sales of $34.8 million for 2009. Gross profit margin improved to 25.8% in the fourth quarter of 2010, up from 9.8% in the fourth quarter of 2009. For the full year, gross profit margin increased to 17.9% from 11.7% in 2009.

* * *

"We believe our financial results demonstrate that 2010 was a successful year for Ener1," said Ener1 Chairman and CEO Charles Gassenheimer. "Our strategy of creating three business units - transportation, grid and small-pack - has put us on the right track by bringing a laser focus to our solutions-based execution." Gassenheimer added: "But, Ener1 is more than just a lithium-ion battery manufacturer. Our cells and our modular packaging design are distinct advantages over our competitors, and we have used this advantage to create best-in-class product suites for each business segment. This approach has helped us secure

incremental orders from existing customers, and quickly ramp-up to win opportunities from customers in new industry segments."

"The highlight of the year remains the launch of our grid energy storage division led by industry veteran Bruce Curtis," Gassenheimer continued. "In a compressed time frame of five months, Ener1 was able to secure a $40MM supply agreement with the MGTES division of the Russian Federal Grid Company. "Yesterday, we signed an MOU with MGTES contemplating the development of uninterruptible power supply systems for transmission substations in Russia. We have estimated global opportunities in the emerging markets to be in the range of hundreds of megawatt-hours and are confident that there will be further demand in these markets for the products we are developing."

"As announced in the second quarter, Ener1 is continuing to make advances in the heavy-duty transportation market," said Tom Goesch, president of Ener1's transportation division. "Ener1 is currently working under contract for the supply of prototype packs for a medium-duty hybrid truck with a new OEM customer. We believe that our products are demonstrating superior quality, safety and longevity, and satisfying our customers' expectations."

"Looking forward, Ener1 will continue to focus on the growing grid energy storage and heavy-duty transportation markets. We believe the need for energy-dense, transportable storage for the grid is urgent and the opportunities are large in scale," concluded Gassenheimer. "The bus and truck market segments are increasingly demanding lithium-ion solutions, and we're optimistic that our products provide optimum characteristics for meeting these customer needs. Ener1 will also continue to pioneer new products for pure electric and hybrid passenger vehicles."

2010 highlights:

- Secured $40MM supply agreement with MGTES division of Russia's Federal Grid Company, as well as a second MOU to explore the development of additional projects
- Finalized Zhejiang Wanxiang Ener1 Power Systems Ltd. joint venture agreement in China
- Developing secondary use applications for community and home energy storage with Duke Energy
- Launched three separate grid energy storage demonstration projects in Japan with ITOCHU Corporation
- Invested in third manufacturing facility based near Indianapolis
- Completed $187.3MM in capital raises through strategic and private investments

27.    Also on March 10, 2011, Ener1 held a conference call with analysts and investors to discuss the earnings press release. During the conference call, one analyst questioned Defendant Gassenheimer regarding the Company's involvement with Think Holdings:

[Analyst:] Okay. And on the funding situation at THINK, I mean, it looks like you pushed out the maturity on the – or the expiration of the line of credit to them. What are the – what's their situation in terms of their own cash levels and funding situation. I mean, I'm just getting – trying to get a sense of what should – what we should be expecting in terms of overall production for THINK this year.

[Defendant Gassenheimer:] Yeah, I mean, it's hard to – THINK is a private company, Dan. So it's hard for me to speculate. Obviously, Ener1 is a shareholder, and board member. Like other shareholders and board members THINK is pulling together their business plans for 2011. And at this point in time, it's difficult for us to give you more color than that because it's not something that we're permitted to discuss. What I would say is though that we are very supportive of THINK and the go-forward plan, we are helping them. And Tom, I don't know, well maybe you could make mention of some of the work we're doing to help THINK in the state of Indiana and the U.S. in terms of vehicle sales.

28.     Also on March 10, 2011, Ener1 filed a Form 10-K with the SEC for the fourth quarter and fully year ended December 31, 2010.  The Form 10-K was signed by Defendants Gassenheimer, Seidel, Kamischke, and Baker and presented the financial results announced in the March 10, 2011 press release.  In addition, the Form 10-K included Sarbanes-Oxley Certifications signed by Defendants Gassenheimer, Seidel and Kamischke as follows:

1.      I have reviewed this annual report on Form 10-K of Ener1, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

29.     In addition, the Company's 2010 Form 10-K included the following relevant statements:

*Accounts Receivable*

As of December 31, 2010, the accounts receivable balance with Think Global totaled approximately $13.6 million, of which $8.5 million is past due. As of February 28, 2011, the accounts receivable balance is approximately $14.3 million, all of which is past due. As of December 31, 2010 and February 28, 2011, we have not established an allowance for doubtful accounts as management believes the accounts receivable balance is collectible. Although there remains a possibility that we may receive cash in payment of these past due accounts receivables, we currently expect to accept additional equity in Think Holdings for at least a portion of these receivables.

*Loan Receivable*

In October 2010, we made short-term working capital loans to Think Holdings totaling $6.4 million, with an interest rate of 5.0% per annum, originally scheduled to mature on December 31, 2010. In November 2010, we issued 625,000 shares of Ener1 common stock to an existing debtor of Think Holdings in exchange for that debtor's $2.5 million receivable from Think Holdings, with an interest rate of 5.0% per annum, originally scheduled to mature on December 31, 2010. We may, at our option, convert the foregoing loans, which total approximately $9.0 million, including accrued and unpaid interest, into shares of Think Holdings Series B Stock. On February 28, 2011, we extended the maturity date of the foregoing loans made to Think Holdings that were originally scheduled to mature on December 31, 2010 to mature on May 1, 2011. On February 28, 2011, we extended the maturity date of the foregoing loans made to Think Holdings that were originally scheduled to mature on December 31, 2010 to mature on May 1, 2011.

In November 2010, we entered into a revolving line of credit agreement (Revolving LOC Agreement) with Think Holdings and established a line of credit for Think Holdings in the aggregate principal amount of $5.0 million, with an original maturity date of February 28, 2011. On February 28, 2011, we amended the Revolving LOC Agreement (Amended Revolving LOC Agreement) with Think Holdings and increased the principal amount from $5million to $15 million and extended the maturity date to March 31, 2011. All funds advanced to Think Holdings under the Revolving LOC Agreement and the Amended Revolving LOC Agreement bear interest at a rate of 12% per annum and are secured by the assets and properties of Think North America, Inc., an indirect subsidiary of Think Holdings, pursuant to a security agreement. During January 2011, we advanced approximately $2.8 million in working capital loans to Think Holdings and on February 28, 2011, in connection with the amendment to the Revolving LOC Agreement we applied the working capital advances to the outstanding balance pursuant to the Amended Revolving LOC Agreement. Think Holdings currently has borrowed $7.8 million under the Amended Revolving LOC Agreement. On March 9, 2011, we extended the maturity date of the Amended Revolving LOC Agreement from March 31, 2011 to May 1, 2011.

\* \* \*

Our primary products for the transportation market consist of battery solutions for HEVs, PHEVs, EVs and other vehicles such as trucks and buses. In 2007, pursuant to a supply agreement (the Think Supply Agreement) with Think Global, we began developing a lithium-ion battery pack designed specifically for the Think City EV. Think Global refinanced its operations in August 2009 after reorganization under Norwegian law. In September 2009, we amended the existing Think Supply Agreement which provided us with, among other rights, an exclusive right to supply battery packs for a certain period and a right of first refusal if Think Global seeks to obtain battery supplies from other battery suppliers. In May 2010, we commenced commercial production and shipment of lithium-ion battery packs for Think Global's Think City electric vehicle utilizing our EV cell and pack. During 2010, we shipped over 1,000 battery packs to Think Global. However, in January 2011, we temporarily stopped shipping battery packs to Think Global at their direction until the company rebalanced its overall inventory levels for the Think City in Europe and the United States.

30.    On May 10, 2011, the Company issued a press release announcing financial results for the first quarter 2011 ended March 31, 2011. In the press release, the Company reported first quarter revenue of $23 million and gross profit margin of 24%. The press release stated in pertinent part as follows:

Ener1, Inc. (NASDAQ: HEV), a leading manufacturer of lithium-ion energy storage systems for transportation, utility grid and industrial applications, today announced financial results for the first fiscal quarter of 2011 ending March 31, 2011.

"We believe our first-quarter results represent another step forward in building a profitable business," said Ener1 Chairman and CEO Charles Gassenheimer. "We took definitive steps on the path toward achieving our goal of being EBITDA positive. More importantly, we have laid a strong foundation within our grid energy storage business, and we anticipate rapid revenue growth in the second half of 2011. We are also seeing positive revenue growth from our industrial small pack business, and we have repositioned our transportation business to attack the medium- and heavy-duty markets. In addition, we expect our joint venture with Wanxiang to come on-line in the second half of 2011 adding to our growth trajectory this year."

Total consolidated revenue for the quarter was $23.1 million, an increase of 110% over the first quarter of 2010. Consolidated gross profit margin improved to 24%, compared to 10% in the year-ago quarter. Due primarily to an impairment charge, the company reported a net loss of $84.7 million, or diluted net loss per share of $0.51 for the quarter. The impairment charge represents a $69.4 million increase in net loss, which represents a one-time $59.4 million impairment recorded during the first quarter to write down the company's investment in Think Holdings and a $13.9 million loss on financial instruments, which is primarily attributable to the impaired value of the investment. The impairment charge and loss on financial

instruments totaled $73.3 million, or $0.44 per diluted share, for the three months ending March 31, 2011. This compares to a net loss of $15.3 million, or diluted net loss per share of $0.13, during the same period last year.

First quarter highlights included:

- Final testing began on two grid energy storage units for the Russian Federal Grid Company to be shipped in the next few weeks;
- Completion of delivery of nine batteries to Hyundai Heavy Industries by Ener1's transportation group to power all-electric transit buses in Seoul and securing of an order for ten additional systems to be delivered in the third quarter;
- An increase in revenue by 12% and improved gross margin percentage of 22% over the same quarter last year by our small pack business, which provides lithium-ion battery solutions to companies like Motorola;
- A new president, Chris Cowger, formerly vice president and general manager of AMD's global consumer software and peripherals division.

"As the market for lithium-ion-based energy storage systems unfolds, Ener1 will continue to differentiate itself through its prismatic-based, high-energy product suite," Gassenheimer said. "We believe we have taken the right steps to position ourselves - including adopting the right strategy, management team, products and technology - to deliver value to our shareholders."

31.     Also on May 10, 2011, Ener1 filed a Form 10-Q with the SEC for the first quarter of 2011 ended March 31, 2011.  The Form 10-Q was signed by Defendants Gassenheimer, Seidel, and Kamischke, and presented the financial results announced in the May 10, 2011 press release.  In addition, the Form 10-Q included SOX Certifications signed by Defendants Gassenheimer, Seidel, and Kamischke which included language substantially similar to the certifications identified in ¶28.

32.     In addition, the Form 10-Q stated the following regarding the Company's dealings with Think Global:

*Accounts Receivable*
As of March 31, 2011, our accounts receivable balance with Think Global totaled approximately $14.1 million, all of which is past due.  As of March 31, 2011, we have not established an allowance for doubtful accounts as our management believes we will realize full value on these accounts receivable, which may include our receipt of equity or other value in connection with a potential equity restructuring of Think Holdings.  We will continue to evaluate whether events or circumstances have occurred or have failed to occur which may impact the collectability of these accounts receivable.  If we determine the collectability of

these accounts receivable are impacted,  we will recognize a loss up to approximately $14.1 million, which could have a material adverse affect on our financial position and results of operations in future reporting periods.

### Loans Receivable

As of March 31, 2011, the outstanding balance of our loans receivable with Think Holdings, including accrued interest, totaled approximately $18.2 million, of which $9.1 million is outstanding under a revolving line of credit and $9.1 million is outstanding pursuant to short-term working capital loans.

On February 28, 2011, we amended the existing revolving line of credit agreement (Amended Revolving LOC Agreement) with Think Holdings, increased the principal amount available under the credit agreement from $5 million to $15 million and extended the maturity date to March 31, 2011.  On March 9, 2011, we extended the maturity date of the Amended Revolving LOC Agreement from March 31, 2011 to May 1, 2011.   We subsequently extended the maturity date to June 15, 2011.  All funds advanced to Think Holdings under the Amended Revolving LOC Agreement bear interest at a rate of 12% per annum and are secured by the assets and properties of Think North America, Inc., an indirect subsidiary of Think Holdings, pursuant to a security agreement.   During the three months ended March 31, 2011, we advanced approximately $3.8 million to Think Holdings pursuant to the Amended Revolving LOC Agreement.  Currently, we do not plan to advance any additional funds to Think Holdings pursuant to the Amended Revolving LOC Agreement.

During 2010, we made several short-term working capital loans to Think Holdings totaling $8.9 million, with an interest rate of 5.0% per annum, originally scheduled to mature on December 31, 2010.  We may, at our option, convert these loans including accrued and unpaid interest, into shares of Think Holdings Series B Stock.  On February 28, 2011, we extended the maturity date of these loans from December 31, 2010 to May 1, 2011.  We subsequently extended the maturity date to June 15, 2011.

As of March 31, 2011, our management believes we will realize full value on these loans receivable, which may include our receipt of equity or other value in connection with a potential equity restructuring of Think Holdings.  We will continue to evaluate whether events or circumstances have occurred or have failed to occur which may impact the collectability of these loans.  If we determine the collectability of these loans receivable are impacted, we will recognize a loss up to approximately $18.2 million which could have a material adverse affect on our financial position and results of operations in future reporting periods.

* * *

### Transactions with Think Holdings

In September 2009, we amended the existing supply agreement with Think Global, an EV manufacturer, for our production of battery packs for their Think City EV.  During 2009 and 2010, Ener1 gradually increased its equity investment

in Think Holdings, AS (Think Holdings) the majority owner of Think Global. This increased commitment to Think Holdings reflected our strategic assessment of the potential significance of EVs in the transportation industry as a market for lithium-ion battery technology. While we continue to believe that EVs are a significant potential market for lithium-ion battery technology, we also now expect EV adoption will be at a more gradual pace and take longer than had been expected due primarily to vehicle cost and slower build out of infrastructure than originally anticipated. We do not currently intend to loan any additional funds to Think Holdings or purchase additional equity securities from Think Holdings.

In January 2011, we stopped shipping battery packs to Think Global at their direction. We do not know when or if we will recommence shipping battery packs to Think Global, the timing of which will depend on Think Holdings' ability to raise sufficient capital to continue operations. In April, Think Global received approximately $3.5 million and anticipates receiving an additional $2 million, from Bzinfin which, based on our knowledge, we expect will enable the company to continue its operations through May 31, 2011.

As of March 31, 2011, our accounts receivable balance with Think Global totaled approximately $14.1million, all of which is past due. We have not established an allowance for doubtful accounts as management believes we will realize full value on these accounts receivable, which may include our receipt of equity or other value in connection with a potential equity restructuring of Think Holdings. We will continue to evaluate whether events or circumstances have occurred or have failed to occur which may impact the collectability of these accounts receivable. If we determine the collectability of these accounts receivable are impacted, we will recognize a loss up to approximately $14.1 million, which could have a material adverse affect on our financial position and results of operations in future reporting periods.

As of March 31, 2011, we have outstanding loans receivable from Think Holdings, including accrued interest, totaling approximately $18.2 million, of which $9.1 million is outstanding under a revolving line of credit and $9.1 million is outstanding pursuant to short-term working capital loans. On February 28, 2011, we amended the revolving line of credit to increase the principal amount from $5 million to $15 million and during the three months ended March 31, 2011, we advanced approximately $3.8 million under this line of credit. All funds advanced to Think Holdings under the revolving line of credit bear interest at a rate of 12% per annum and are secured by the assets and properties of Think North America, Inc., an indirect subsidiary of Think Holdings, pursuant to a security agreement. We may, at our option, convert the $9.1 million of short-term working capital loans into shares of Think Holdings Series B Covertible Preferred Stock (Series B Stock). In May, we extended the maturity dates of both the revolving line of credit and the short-term working capital loans to June 15, 2011. Management believes we will realize full value of these loans receivable, which may include our receipt of equity or other value in connection with a potential equity restructuring of Think Holdings. We will continue to evaluate whether events or circumstances have occurred or have failed to occur which may impact the collectability of these loans. If we determine the collectability of these

loans receivable are impacted, we will recognize a loss up to approximately $18.2 million which could have a material adverse effect on our financial position and results of operations in future reporting periods.

We reviewed our equity investment in Think Holdings for potential impairment at March 31, 2011 and we determined that our investment in Think Holdings was impaired primarily due to the uncertainty of when or if Think Global will recommence operations, which will depend on Think Holdings' ability to raise sufficient capital to continue operations.  As a result, we recorded an impairment loss of approximately $59.4 million during the three months ended March 31, 2011.

At March 31, 2011, we controlled approximately 48% of the outstanding voting power in Think Holdings and Mr. Gassenheimer, one of our directors, also serves on the board of directors of Think Holdings.  Mr. Baker, who is also one of our directors, served on the board of directors of Think Holdings until April 26, 2011, when he resigned from Think Holdings board.  On May 9, 2011, we surrendered to Think Holdings, for no consideration, all shares of Think Holdings' voting equity held by Ener1, including, without limitation, all shares of Series B Stock, based on our determination that our investment in Think Holdings was impaired and written down to zero.

During 2010 and 2011, we granted to certain shareholders of Think Holdings the right to exchange a portion of their shares of Series B Stock in Think Holdings for unregistered shares of Ener1 common stock (the Put Options).  Certain investors have notified us of their intention to exercise their rights pursuant to the Put Options and we are currently in negotiations with these investors to postpone the date on which the Put Options may be exercised to September 15, 2011.  In addition, during 2011 we granted to Investinor, AS (Investinor), an existing shareholder of Think Holdings, the right to exchange all of their shares of Series B Stock in Think Holdings and their rights under a $2.5 million convertible note from Think Holdings for registered shares of Ener1 common stock.   Investinor may exercise these rights on the earlier of June 15, 2011 or the date Ener1 owns less than 20% of the outstanding voting equity of Think Holdings.

33.     On June 22, 2011, the Company filed a Form 8-K with the SEC.  The Form 8-K

stated in pertinent part as follows:

On June 22, 2011, the Audit Committee of the Board of Directors of Ener1, Inc. ("Ener1"), the Chief Executive Officer and the Chief Financial Officer of Ener1 concluded that a material charge was required under generally accepted accounting principles applicable to Ener1 related to the loans receivable of Think Holdings, AS and accounts receivable of Think Global, AS ("Think Global") held by Ener1.  The Audit Committee, Chief Executive Officer and Chief Financial Officer made this conclusion based on the announcement by Think Global that, following an extended and ultimately unsuccessful search for long-term financing, it will file bankruptcy proceedings in the Norwegian courts on June 22, 2011.  Ener1 estimates that the amount of the charge is $35.4 million.  This

17

amount is subject to change to the extent that we receive any recovery as a result of the liquidation of Think Global; we presently believe that any such recovery, to the extent it occurs at all, is not likely to be significant.

## C.      The Truth Comes to Light

34.      On August 9, 2011, after the close of the markets, the Company

announced that it is unable to timely file its quarterly report on Form 10-Q for the quarter

ended June 30, 2011.  The Company filed a Form NT 10-Q, which stated in pertinent part

as follows:

> Ener1, Inc. (Ener1) is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2011 (the Form 10-Q) with the Securities and Exchange Commission (the SEC) by August 9, 2011.  As described in the current report on Form 8-K dated June 22, 2011, the Audit Committee of the Board of Directors of Ener1, the Chief Executive Officer and the Chief Financial Officer of Ener1 concluded that a material charge was required, under generally accepted accounting principles applicable to Ener1, related to the loans receivable of Think Holdings, AS (Think Holdings) and accounts receivable of Think Global, AS (Think Global) held by Ener1. In addition, as disclosed in Ener1's Quarterly Report on Form 10-Q for the quarter ended March 31, 2011, Ener1 recorded an impairment charge to write off its investment in Think Holdings.

> Ener1 requires additional time to assess certain accounting matters related to these charges, including the timing of the recognition of the impairment charge and material charge.  Ener1 intends to file the Form 10-Q as soon as practicable.

35.      After this announcement, Ener1's stock price plunged nearly 10% to close at

$0.75 on August 10, 2011.

36.      On August 16, 2011, the Company issued a press release announcing its intention

to restate its financial results for the year ended December 31, 2010 and quarter ended March 31,

2011.  The press release stated in pertinent part as follows:

> Ener1, Inc. (NASDAQ: HEV), announced today that the company will be restating its financial statements for the period included in an amended annual report on Form 10-K/A for the year ended December 31, 2010, as well as an amended Form 10-Q/A for the quarter ended March 31, 2011.

> The company will restate its financial statements to reflect as of December 31, 2010 the impairments of its investment in Think Holdings (which had previously been recorded in the first quarter of 2011), its accounts receivable with Think

Global and its loans receivable with Think Holdings, including accrued interest. The restatement will also reflect the corrected accounting for revenue recognized in connection with transactions with Think Holdings and Think Global during the year ended December 31, 2010 and the three months ended March 31, 2011, the impact these adjustments have on the fair value of financial instruments and to adjust the elimination of certain intercompany receivables.

All of the restatements involve non-cash items and will have no impact on the company's current or previously stated cash position or cash flows. A current report on Form 8-K that further describes the restatement of the company's financial statements has been filed and is available on the company's web site at www.ener1.com.

37.     Also on August 16, 2011, Ener1 filed a Form 8-K with the SEC regarding its

restatement.  The Form 8-K provided in pertinent part as follows:

On August 10, 2011, the Audit Committee of the Board of Directors of Ener1, Inc. (the Company), based upon a recommendation from management, determined that the Company's financial statements for the year ended December 31, 2010 and for the quarterly period ended March 31, 2011, respectively, should no longer be relied upon and should be restated. This determination was made following an assessment of certain accounting matters related to the loans receivable owed to us by Think Holdings, AS (Think Holdings) and accounts receivable owed to us by Think Global, AS (Think Global) held by the Company and the timing of the recognition of the impairment charge related to the Company's investment in Think Holdings originally recorded during the quarter ended March 31, 2011.

The Company concluded that it was necessary to amend its Annual Report on Form 10-K for the year ended December 31, 2010 and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 in order to restate its financial statements to (1) reflect as of December 31, 2010 the impairments of (i) our investment in Think Holdings (which had previously been recorded in the first quarter of 2011), (ii) our accounts receivable with Think Global and (iii) our loans receivable with Think Holdings, including accrued interest, (2) reflect the corrected accounting for revenue recognized in connection with transactions with Think Holdings and Think Global during the year ended December 31, 2010 and the three months ended March 31, 2011, (3) reflect the impact these adjustments have on the fair value of financial instruments and (4) to adjust the elimination of certain intercompany receivables. While the Company has not finalized the consideration of the impact of these adjustments on its assessment of internal control over financial reporting, the Company has concluded that these adjustments were the result of one or more material weaknesses in internal control over financial reporting. Ener1 is currently in the process of determining whether the Company has sufficient liquidity to fund its operations.

Executive officers authorized by the Audit Committee of the Board of Directors have discussed the matters disclosed in this Form 8-K with

PricewaterhouseCoopers LLP, the Company's independent registered public
accounting firm.

The Company will file an amendment to its Form 10-K for the year ended
December 31, 2010 and Form 10-Q for the quarterly period ended March 31,
2011.   The company is still assessing the adjustments…

38.     After the Company's announcement of the restatement, Ener1's stock price

plummeted over 42% to close at $0.45 per share, on unusually heavy volume.

39.     On August 19, 2011, the Company issued a press release announcing that it had

received a letter from the NASDAQ stating that it was not in compliance with the NASDAQ's

listing requirements due to its failure to timely file its Form 10-Q.   The press release stated in

pertinent part as follows:

Ener1, Inc. (NASDAQ: HEV) (the "Company"), today reported that it has
received a letter from The NASDAQ Stock Market ("NASDAQ") stating that it is
not in compliance with Listing Rule 5250(c)(1) because the Company did not
timely file its Quarterly Report on Form 10-Q for the period ended June 30, 2011.
The NASDAQ letter was issued in accordance with standard NASDAQ
procedures due to the delayed filing, which the Company previously disclosed on
Form 12b-25 filed with the Securities and Exchange Commission on August 9,
2011.

The Company intends to file its Form 10-Q for the quarter ended June 30, 2011
with the Securities and Exchange Commission to regain compliance with
NASDAQ Listing Rule 5250(c)(1). In addition to filing the Form 10-Q, the
Company intends to submit a plan to regain compliance to NASDAQ no later
than October 17, 2011. No assurance can be given that NASDAQ will accept the
company's compliance plan or grant an exception for the full 180-day period
contemplated by the NASDAQ Listing Rules. Under the NASDAQ rules, the
Company's common stock will continue to be listed on NASDAQ until October
17, 2011, and for any exception period that may be granted to the Company by
NASDAQ. However, until the company regains compliance, quotation
information for the Company's common stock will include an indicator of the
Company's non-compliance and the Company will be included in a list of non-
compliant companies on the NASDAQ website.

40.     As a result of Defendants materially false and misleading statements and omissions during the Class Period, Plaintiff and the other members of the Class have suffered millions of dollars in damages.

## V.    THE INDIVIDUAL DEFENDANTS' LIES AND OMISSIONS

41.     Ener1's statements and filings during the Class Period were materially false and misleading because they failed to disclose and misrepresented: (1) that Think Holdings and Think Global suffered from significant capital issues that threatened those companies' ability to maintain operations; (2) that, because of these capital issues, the Company should have taken an impairment charge for the value of its investments in Think Holdings and Think Global since the Company's loan and account receivables due from these companies were uncollectible; (3) that the Company's financial statements were not prepared in accordance with GAAP; (4) that the Company lacked adequate internal and financial controls; and (5) as a result of the foregoing, the Company's financial statements were false and misleading at all relevant times.

42.     In addition to the false and misleading statements and omissions described in detail herein, Defendants also failed to disclose the truth regarding Ener1's financial condition. Defendants failed to tell the public the true risks the Company was faced with, and failed to disclose that the Company was engaged in fraudulent and deceptive accounting practices.  As a result, Ener1's reported financial results were materially false and misleading at all relevant times.

## VI.    GAAP AND SEC RULE VIOLATIONS

43.     Ener1's financial statements and reports during the Class Period were materially false and misleading.  Defendants stated that such statements were prepared in conformity with GAAP and SEC accounting rules.  However, the statements identified above were not prepared in conformity with GAAP and the financial information included in such statements did not

provide a fair presentation of the Company's financial conditions and operations due to Ener1's improper and inadequate accounting and disclosures, all in violation of GAAP.

44.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

45.     SEC Rule 12b-20 requires that financial reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

46.     Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided.  Instructions to Item 303 require that this discussion identify any significant elements of a registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business.

47.     The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by APB Opinion No. 28.

48.     Ener1's financial statements contained in its reports filed with the SEC throughout the Class Period were presented in a manner that violated GAAP, including the following:

(a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)     The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents

underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

49.     In addition, Ener1's filings during the Class Period violated SEC disclosure rules in that:

(a)     Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws, and that failure to disclose material information rendered the statements that were made during the Class Period materially false and misleading; and

(b)     Defendants failed to file with the SEC financial statements that conformed to the requirements of GAAP, and by doing so such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. 210.4-01(a)(1).

50.     Accordingly, the adverse information concealed by Defendants during the Class Period was in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. § 229.303).  Defendants were required to disclose, and failed to disclose, in the Company's financial statements the existence of material facts described herein.  Defendants failed to appropriately recognize and report assets, revenues and expenses in conformity with

GAAP. Defendants failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP.

## VII.   UNDISCLOSED ADVERSE INFORMATION

51.     The market for Ener1's securities was an open, well-developed and efficient market at all relevant times. As a result of the materially false and misleading statements and failures to disclose described herein, Ener1's securities traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Ener1's securities relying upon the integrity of the market price of Ener1's securities and market information related to Ener1, and have been damaged thereby.

52.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Ener1's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, and financial operations, as alleged herein.

53.     At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Ener1's financial condition and accounting.

54.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Ener1 and its financial condition, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times. Defendants' false and misleading statements during the Class Period resulted in Plaintiff and the

25

other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## VIII.   SCIENTER ALLEGATIONS

55.     As alleged herein, the Individual Defendants acted with scienter in that Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

56.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Ener1, their control over, receipt and/or modification of Ener1's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Ener1, participated in the fraudulent scheme alleged herein.

57.     The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## IX.   STATUTORY SAFE HARBOR

58.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected." Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

26

59.     Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or approved by an executive officer of Ener1 who knew that such statement was false when made.

X.     **LOSS CAUSATION**

60.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Ener1's securities and operated as a fraud or deceit on Class Period purchasers of Ener1's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Ener1's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Ener1's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

61.     By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status.  Therefore, Defendants presented a misleading picture of Ener1's business practices and procedures.  Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Ener1 to conceal the truth.

62.     Defendants' false and misleading statements had the intended effect and caused Ener1's common stock to trade at artificially inflated levels throughout the Class Period.  The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

63.     The decline in the price of Ener1's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors

27

and the market. The timing and magnitude of Ener1's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Ener1's securities and the subsequent decline in the value of Ener1's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

64.    At all relevant times, the market for Ener1 stock was an efficient market for the following reasons, among others:

a.    Ener1  securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.    As a regulated issuer, Ener1 filed periodic public reports with the SEC and the NASDAQ;

c.    Ener1 securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d.    Ener1 regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

65.    As a result, the market for Ener1 securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in Ener1's stock price. Under these circumstances, all purchasers of Ener1 common stock during

the Class Period suffered similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## XII.   CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Ener1 securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Ener1 and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

67.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, Ener1 securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "HEV". As of February 28, 2011, the Company had approximately 164.8 million shares outstanding.   Record owners and other members of the Class may be identified from records maintained by Ener1 and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

68.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.      whether Defendants participated in and pursued the common course of conduct complained of herein;

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Ener1;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Ener1;

e.      whether the market price of Ener1 common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XIII.   COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

72.   Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

73.   During the Class Period, Ener1 and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the  other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ener1 common stock; and (iii) cause Plaintiff and the other members of the Class to purchase Ener1 stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

74.   These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ener1 securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Ener1, as alleged herein.

75.   In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate

truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

76.     Ener1 and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Ener1 as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ener1's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Ener1 and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Ener1's securities during the Class Period.

77.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and

reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

78.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Ener1's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

79.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Ener1 securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Ener1 shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants

during the Class Period, Plaintiff and the other members of the Class acquired Ener1 securities during the Class Period at artificially inflated high prices and were damaged thereby.

80.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Ener1, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Ener1 securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

81.     By virtue of the foregoing, Ener1 and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

83.     Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

84.     The Individual Defendants were and acted as controlling persons of Ener1 within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants

34

was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

86.    As set forth above, Ener1 and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

**d)**    Awarding such other relief as this Court deems appropriate.

XV.   **JURY DEMAND**

Plaintiff demands a trial by jury.


Dated:  August 26, 2011

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

By: _____
Curtis V. Trinko (CT-1838)
Jennifer Traystman (JT-7583)
16 West 46th Street, 7th Floor
New York, New York 10036
Tel: 212 490-9550
Fax: 212 986-0158
Email: Ctrinko@trinko.com

**SAXENA WHITE P.A.**
Joseph E. White III
Christopher S. Jones (CJ-4131)
Lester R. Hooker
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3082

*Attorneys for Plaintiff*

## SCHEDULE A

### Purchases

| Date | # Shares | Price/Share |
|------|----------|-------------|
| 4/22/10 | 1000 | $4.33 |
| 2/18/11 | 200 | $3.78 |
| 7/25/11 | 1700 | $0.94 |

### Sales

| Date | # Shares | Price/Share |
|------|----------|-------------|
| N/A | | |

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, C. Bickley Foster, certify that:

1. I have reviewed a complaint and I authorize Saxena White P.A. to act on my behalf in this matter in filing as a named plaintiff and applying for Lead Plaintiff status, and for all other purposes in connection with this litigation.

2. I did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. I am willing to serve as a Lead Plaintiff or class representative, either individually or as part of a group. I understand that a Lead Plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am authorized to execute this Certification on behalf of the purchasers of the subject securities described herein (including, as the case may be, myself, any co-owners, any corporations or other entities, and/or any beneficial owners).

5. I will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party or Lead Plaintiff.

7. I have listed below all my transactions in the securities offered, including the Class Period as follows:

| Type of Security (Common stock) | Purchase/Acquisition or Sale/Disposition | Quantity | Trade Date (mm/dd/yy) | Price per Share/Security ($) |
|---|---|---|---|---|
| SEE ATTACHED SCHEDULE A | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

(* List additional transactions on separate sheet, if necessary)

These securities were acquired or held in (check all that apply):

☑ General (non-retirement account)    ☐ Merger/acquisition/distribution    ☐ Gift
☐ IRA    ☐ Employer-sponsored plan (401k, 403b, etc.)

8. During the three years prior to the date of this Certification, I have not sought to serve and I have not served as a representative party for a class in an action filed under the federal securities laws except as described below (if any):

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this ___24th___ day of August, 2011

C. Bickley Foster
Name (print)

_C. Bickley Foster_
Signature